20 ATLANTIC AVENUE CORP., and Michael P. Vining, Plaintiffs and Defendants in counterclaim,

v.

ALLIED WASTE INDUSTRIES, INC., Defendant, Plaintiff in counterclaim and third-party Plaintiff,

v.

David T. Vining, Third-party Defendant and Plaintiff in counterclaim,

v.

Allied Waste Industries, Inc., Defendant in counterclaim.

C.A. No. 03–10987–MLW.

United States District Court, D. Massachusetts.

March 30, 2007.

James L. Ackerman, Wadland & Ackerman, Andover, MA, for David T. Vining.

Neal James Bingham, Davis, Malm & D'Agostine, P.C., Boston, MA, for David T. Vining and 20 Atlantic Avenue Corp.

Anthony Bolzan, Erica L. Hovani, Dechert LLP, Boston, MA, for Allied Waste Industries, Inc.

Laurence M. Johnson Davis, Malm & D'Agostine, P.C., Boston, MA, for 20 Atlantic Avenue Corp.

Kathleen N. Massey, Dechert LLP, New York, NY, for Michael P. Vining and Allied Waste Industries, Inc.

Edward A. McDonald, Dechert LLP, New York, NY, for Allied Waste Systems, Inc. and Allied Waste Industries, Inc.

Stephanie L. Moon, Wadland & Ackerman, Andover, MA, for Allied Waste Systems, Inc. and David T. Vining.

Matthew A. Porter, Jackson Lewis LLP, Boston, MA, for Allied Waste Systems, Inc.

## MEMORANDUM AND ORDER

WOLF, District Judge.

The court has received the attached Magistrate Judge's Report and Recommendation on the cross-motions for summary judgment filed by defendant Allied Waste Industries, Inc. and third-party defendant David Vining. The matters as to which objection has been made have been reviewed *de novo*. *See* 28 U.S.C. § 636(b)(1)(B) & (c); *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir.1986). The court finds the Magistrate Judge's Report and Recommendation to be thorough, thoughtful and, with one exception, persuasive. It is, therefore, hereby adopted by the court and incorporated in this memorandum, except as follows.

The magistrate judge recommended that the court grant Allied's motion for summary judgment on Count IX, negligent misrepresentation as to the Recycling Agreement, of plaintiff's complaint because she found "no evidence that Allied's misrepresentations as to its present intention to comply with the terms of its Agreement were negligently made." Report and Recommendation at 46. The magistrate judge also recommended that the court deny Allied's motion for summary judgment on Count VII, fraudulent misrepresentation as to the Recycling Agreement, because plaintiff submitted "sufficient facts for a jury to find that Allied misrepresented its present intention to comply with the terms of the Recycling Agreement when it entered into the Agreement in 1997." *Id.* at 46–47. The magistrate judge essentially recommended that the evidence that is sufficient to prove a fraudulent misrepresentation claim in this case is not sufficient to prove the negligent misrepresentation claim.

■ Under Massachusetts law, "in order to recover for negligent misrepresentation, a plaintiff must show that the defendant: (1) in the course of its business, (2) supplied false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance upon the information, and (6) that it failed to exercise reasonable care or competence in obtaining or communicating the information." *Cummings v. HPG Int'l, Inc.*, 244 F.3d 16, 24 (1st Cir.2001). "[T]he degree of culpability a plaintiff must prove to establish liability for negligent misrepresentation is different, and less demanding, than that to establish liability for deceit." *Id.* Generally, when analyzing negligent misrepresentation claims, Massachusetts courts ask whether the speaker was negligent in failing to discover the falsity of his or her statements. *Id.* Plaintiff must establish that defendant's statements regarding intent were false when made. *Id.* at 25. Future performance, or lack thereof, does not alone serve as a basis for a negligent misrepresentation claim. *Id.* However, lack of present intent to perform is a question of fact susceptible to proof like any question of fact, including resort to circumstantial evidence. *See Bolen v. Paragon Plastics, Inc.*, 754 F.Supp. 221, 226 (citing *Barrett Associates, Inc. v. Aronson*, 346 Mass. 150, 152, 190 N.E.2d 867 (1963)).

■ Here, plaintiffs are opposing the motion for summary judgment. However, the burden of proof at trial is on plaintiffs. Therefore, to survive summary judgment on its negligent misrepresentation claim, plaintiffs must " 'produce specific facts, in suitable evidentiary form,' " *McIntosh v.*

*Antonino,* 71 F.3d 29, 33 (1st Cir.1995) (quoting *Morris v. Government Dev. Bank,* 27 F.3d 746, 748 (1st Cir.1994)), supporting each of the six elements of negligent misrepresentation. *See North Am. Specialty Ins. Co. v. Lapalme,* 258 F.3d 35, 42 (1st Cir.2001). The evidence plaintiff submitted in support of its fraudulent misrepresentation claim also supports its negligent misrepresentation claim. Specifically, plaintiff points out that the contract expressly provides that Allied's obligations thereunder "constitute[ ] a material inducement to the stockholders of Atlantic and Vining to agree to the sale of [VDSI] to Allied[.]" Recycling Agreement at preamble, 2. Immediately following consummation of the agreement, Allied began underperforming its contractual obligations. *See* Plaintiff's Undisputed Facts, ¶¶ 13–14, 17. Plaintiff Michael Vining complained, but was told that "Allied had other operational problems in the Boston district and couldn't worry about delivering recyclables to [Atlantic]." *Id.* at ¶ 20. Allied took the position that the agreement "sucked" and was "difficult" to follow. *Id.* at ¶ 21. Plaintiff also submitted evidence that Allied asserted its belief that the agreement "wasn't worth the paper it's written on." *Id.* at ¶ 30.

These facts create a genuine question of fact as to each of the six elements plaintiff must prove at trial for summary judgment purposes. Therefore, the court is adopting the magistrate judge's recommendation as to all counts except for Count VII.

Accordingly, for the reasons stated in the Report and Recommendation, except with regard to plaintiffs' negligent misrepresentation claim, it is hereby ORDERED that:

1. Allied's motion for summary judgment (Docket No. 75) as to Counts III (breach of contract), VI (breach of implied covenant of good faith and fair dealing), VIII (fraudulent misrepresentation), X (negligent misrepresentation), and I (Mass. Gen. Laws ch. 93A, to the extent that this count relates to Allied's performance under the 2001 Letter of Intent) is ALLOWED.

2. Allied's motion for summary judgment (Docket No. 75) as to Counts VII (fraudulent misrepresentation), IX (negligent misrepresentation), and I (Mass. Gen. Laws ch. 93A, to the extent this count relates to Allied's performance under the Recycling Agreement) is DENIED.

3. Allied's motion for summary judgment (Docket No. 75) as to the interpretation of the term "Greater Boston Area" and its view that the court should consider the Recycling Agreement an installment contract is DENIED.

4. David Vining's motion for summary judgment (Docket No. 104) is DENIED.

### REPORT AND RECOMMENDATION ON ALLIED'S MOTION FOR SUMMARY JUDGMENT

DEIN, United States Magistrate Judge.

November 16, 2006

### I. INTRODUCTION

This litigation arises out of several related business transactions between the plaintiffs 20 Atlantic Packaging, Inc. ("Atlantic") and Michael P. Vining ("Michael") (collectively, the "Plaintiffs"), the defendant Allied Waste Industries, Inc. ("Allied"), and Michael's brother, the third party defendant David T. Vining ("David"). Specifically, in 1997, Allied acquired a trash collection business owned by the Vinings. This transaction was detailed in a 1997 Merger Agreement and a related Recycling Agreement. As a result of disputes relating to the parties' performance under these agreements, the parties engaged in discussions concerning Allied's potential acquisition of a separate paper recycling company owned by the Vinings, the plaintiff Atlantic. It was anticipated

that the parties' disputes would be resolved in connection with Allied's acquisition of Atlantic. A letter of intent ("LOI") was signed in 2001. However, the acquisition was never consummated, leading to another round of disputes.

This matter is presently before the court on Allied's motion for summary judgment (Docket No. 75) and David Vining's motion for summary judgment (Docket No. 104). For the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that Allied's motion be ALLOWED IN PART and DENIED IN PART, and that David Vining's motion be DENIED. Specifically, with respect to the three agreements at issue in this case, this court recommends as follows:

*The 2001 Letter of Intent:* This court finds that the 2001 LOI executed by the parties does not rise to the level of an enforceable contract, and that the record does not support a finding that Allied misrepresented its intention to perform under the LOI at the time of its execution. Therefore, this court recommends that Allied's motion for summary judgment be ALLOWED as to Count III (breach of contract), Count VI (breach of implied covenant of good faith and fair dealing), Count VIII (fraudulent misrepresentation), Count X (negligent misrepresentation), and Count I (Mass. Gen. Laws ch. 93A) to the extent this count relates to Allied's performance under the LOI.

*The Recycling Agreement:* This court finds that the clear terms of the Recycling Agreement does not require Atlantic to proffer its price list monthly as a condition precedent for Allied's obligation to deliver recyclables. Further, the term "Greater Boston area" as used in the Recycling

Agreement includes the City of Boston. Therefore, this court recommends that Allied's motion for summary judgment, which asked this court to interpret the Recycling Agreement to the contrary, be DENIED. This court further concludes that there is sufficient evidence to go to the jury on the issue whether Allied misrepresented its intentions to perform under the Recycling Agreement, but not whether such misrepresentations were made negligently. Therefore, this court recommends that Allied's motion for summary judgment as to Count VII (fraudulent misrepresentation) and Count I (Mass. Gen. Laws ch. 93A) to the extent this count relates to Allied's performance under the Recycling Agreement, be DENIED, and that the motion as to Count IX (negligent misrepresentation) be ALLOWED.

*The Merger Agreement:* Both Allied and David Vining have asked this court to interpret various provisions of the 1997 Merger Agreement. This court finds that the current portion of long term debt should be included in the post-closing adjustment of working capital, and that Allied's motion should therefore be ALLOWED. However, there are disputed facts which preclude the entry of summary judgment on the points raised by David Vining. Therefore, this court recommends that David's motion for summary judgment be DENIED.

## II. STATEMENT OF FACTS RELATING TO THE 2001 LETTER OF INTENT[1]

The motion for summary judgment raises various issues relating to each of the parties' agreements. For convenience, following a general overview of the parties'

---

1. The facts relating to the LOI and Recycling Agreement are derived primarily from Allied's "Local 56.1 Concise Statement of Material Facts as to Which There is No Genuine Issue

for Trial" (Docket No. 79) ("DSF"); "Plaintiffs' Rule 56.1 Counterstatement of the Material Facts Relied Upon in Opposition to the

business relationships, the facts and law relating to each agreement will be discussed separately, beginning with the 2001 Letter of Intent. The following facts are undisputed unless otherwise indicated.

### Overview

In 1997, Allied acquired Vining Disposal Services, Inc. ("VDSI"), a trash collection and hauling business owned by Michael and David Vining. (DSF ¶ 2; PSF ¶ 1). This transaction was documented in a 1997 Merger Agreement and related agreements (the "1997 Merger Agreement"). (DSF ¶ 2). Allied claims that Michael and David have failed to pay amounts due as a result of certain post-closing adjustments owed under the 1997 Merger Agreement, and Michael and David contend that monies are due to them from Allied under the 1997 Merger Agreement. (*See* DSF ¶ 7; PSF ¶¶ 48–50).[2]

When they sold VDSI in 1997, Michael and David retained ownership of their separate paper recycling company, Atlantic, and the land on which it was located. (DSF ¶ 3; PSF ¶ 1). Prior to the 1997 transaction, VDSI had been bringing its paper and cardboard recyclable products to Atlantic, as had a number of other truckers, including Waste Management, BFI and several smaller haulers. (PSF ¶ 2). As part of the 1997 transaction, Allied entered into an agreement with Atlantic pursuant to which Allied agreed to deliver, and Atlantic agreed to accept, certain paper recycling product collected by Allied (the "Recycling Agreement"). (DSF ¶ 3). The Plaintiffs claim that Allied breached the Recycling Agreement by failing to deliver product and engaged in other wrongful conduct in connection with that Agreement, which Allied denies. (*See* DSF ¶ 6).[3]

On August 8, 2001, Allied and Atlantic entered into a letter of intent relating to the proposed acquisition of Atlantic by Allied. (DSF ¶ 4). Plaintiffs contend that the 2001 Letter of Intent ("LOI") is an enforceable agreement, and have asserted claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and misrepresentation arising out of the LOI. (DSF ¶ 5). For its part, Allied contends that the LOI does not rise to the level of an enforceable contract and that it did not misrepresent its intention to perform under the LOI.[4]

---

Motion for Summary Judgment" (Docket No. 110) ("PSF"); and the "Supplement to Plaintiffs' Counterstatement of Material Fact" (Docket No. 155) ("PSupp."). Most of the defendant Allied's Exhibits are submitted with the "Affidavit of Frances S. Cohen in Support of Defendant's Motion for Summary Judgment" (Docket No. 81) ("Def.Ex."). Most of the Plaintiffs' Exhibits are submitted with the "Affidavit of Neal J. Bingham and Appendix of Exhibits to Plaintiffs' Rule 56.1 Counterstatement of Material Facts" (Docket No. 112) ("Pls.Ex.").

2. In its motion for summary judgment, Allied asks the court to interpret the working capital calculation in the Merger Agreement. David Vining has also moved for summary judgment on the Merger Agreement, asking the court to rule on whether various calculations were appropriately made under the Agreement.

3. As part of its motion for summary judgment, Allied has asked the court to interpret the Recycling Agreement as a matter of law to find that it was an installment contract that required Atlantic to tender its price list monthly as a condition precedent to Allied's obligations to deliver recycling. (Allied Mem. (Docket Nos. 89–90) at 4). It has also asked that the term "Greater Boston and North Shore area" as used to define the Service Area in the Agreement be interpreted as excluding the City of Boston. (*Id.* at 49–50). Finally, Allied has moved for summary judgment on Plaintiffs' claims that Allied is liable for fraudulent and negligent misrepresentations about its intention to perform under the Recycling Agreement (Counts VII and IX) and that such conduct constitutes a violation of Mass. Gen. Laws ch. 93A (Count I).

4. Allied has moved for summary judgment on Plaintiffs' claims that Allied's failure to close

### The Events Leading to the 1997 Merger Agreement

Some background concerning the circumstances leading up to the parties' consummation of the 1997 Merger Agreement is necessary to put the relevant agreements in context. Thus, in July 1997, Allied, the shareholders of VDSI and Universal Truck Lease, Inc. entered into a "Letter of Intent" concerning Allied's acquisition, by means of a stock purchase, of the trash collection and hauling business operated by those two related companies (the "1997 LOI"). (DSF ¶ 8, Def. Ex. 3). The 1997 LOI confirmed the "agreement in principle" for the "proposed acquisition, on the terms and conditions set forth [therein.]" (Def. Ex. 3 at 1). The stock purchase was to be based on "representations and conditions to be set forth in a definitive written stock exchange agreement" and there was also to be a "mutually acceptable agreement with Atlantic" for recycling, a "mutually acceptable lease" of the property used by VDSI, employment agreements with Michael, among others, and a consulting agreement with David. (*Id.* at 1, 3–4). The 1997 LOI further provided that it was "expressly understood" by the signatories "that the consummation of the transaction contemplated by this agreement in principle is subject to, among other things: (a) execution . . . of a mutually acceptable definitive written stock exchange agreement" as well as board approval, receipt of governmental approvals and the satisfactory result of Allied's due diligence, among other things. (*Id.* at 6). The 1997 LOI, which had a closing date of August 31, 1997 (which was later changed to September 30, 1997), further

provided for what is known as a "no-shopping" period. (*See Id.* at 5, 7; DSF ¶ 9). As the letter provided:

> In consideration of the considerable expense to be incurred by Allied in connection with the transaction contemplated by this agreement in principle, neither the Companies nor you will engage in any negotiation with another person for a period of ninety (90) days from the date of execution set forth below.

(Def. Ex. 3 at 7). The letter was "agreed to in principle" on July 24, 1997.(*Id.*). The parties dispute whether this 1997 LOI constituted a binding agreement. (*See* DSF ¶ 11; PSF ¶¶ 32–34; PSupp. ¶ 11). Nevertheless, it is undisputed that subsequent to the 1997 LOI, the parties continued their negotiations, and eventually executed formal and complex agreements.

### The 1997 Merger Agreement

Effective October 1, 1997, Allied and VDSI (by its shareholders Michael and David Vining) executed the 1997 Merger Agreement. (Def. Ex. 2 at Dep. Ex. 19). The terms of the Merger Agreement were not identical to those of the 1997 LOI. For example, but without limitation, the cash payment was increased, and Allied did not enter into a lease of the property. (*See* DSF ¶ 12). The Merger Agreement included 27 representations and warranties by the seller relating to, *inter alia*, VDSI financial statements, accounts receivable, tax status and insurance. (DSF ¶ 18). It also contained a "revenue guarantee," which had not been mentioned in the LOI and which warranted the level of customer accounts prior to the LOI and in the months subsequent to its execution. (DSF ¶ 18). The Merger Agreement itself is 41

---

under the 2001 "agreement" constitutes a breach of contract (Count III), and breach of the implied covenant of good faith and fair dealing (Count VI), that Allied is liable for fraudulent and negligent misrepresentations

about its intention to complete the acquisition of Atlantic's business and assets under the 2001 "agreement" (Counts VIII, X), and that Allied's fraudulent conduct constitutes a violation of Mass. Gen. Laws ch. 93A (Count I).

pages in length, with approximately 4,000 pages of documents attached and 65 exhibits, including employment agreements and non-competition agreements for the principal officers, schedules identifying VDSI's assets, including its equipment, vehicles, customers and real property, and board resolutions authorizing the transaction. (DSF ¶ 17). In addition to the Merger Agreement, effective September 22, 1997, Allied and VDSI on the one hand, and Atlantic on the other, executed a Recycling Agreement, the terms of which will be discussed in further detail below. (DSF ¶ 15).

### Events Following the 1997 Agreements

As part of the 1997 transaction, Michael Vining entered into an employment/non-competition agreement, pursuant to which he was to serve as the District Manager for VDSI with responsibility for essentially running the company, including the collection of recycling materials for delivery to Atlantic. (DSF ¶¶ 19, 20). It is undisputed that Michael lasted in this position for only two weeks. (DSF ¶ 21; PSF ¶ 14). Plaintiffs place the blame on Allied's local employees, whom they contend were uncooperative, while Allied contends that Michael simply did not work, although he collected his annual $100,000.00 salary for five years. (See PSF ¶¶ 11–14; DSF ¶¶ 23–24).

In addition, following the execution of the 1997 Agreements, serious disputes arose between the parties as to whether Allied was delivering all the recyclables it was supposed to deliver to Atlantic under the Recycling Agreement, among other things. (See PSF ¶¶ 17–31). The parties have moved for summary judgment on a number of the issues relating to the Recycling Agreement, the facts of which will be

addressed below. For present purposes, suffice it to say that the disputes under the Recycling Agreement led the parties to resurrect earlier discussions they had had about Allied's acquisition of Atlantic, the recycling company. (See PSF ¶¶ 35–40).

### 2001 Letter of Intent

Effective August 8, 2001, Allied and Atlantic executed a document entitled "Letter of Intent."[5] All parties agree that this court's decision as to the enforceability of the 2001 LOI should be governed by the terms of the letter, which all parties characterize as clear and unambiguous. (See Pls.' Opp. (Docket No. 109) at 16; Allied Mem. (Docket Nos. 89–90) at 33).

The 2001 LOI provides that it "will confirm the agreement in principle" between Allied and Atlantic, and Michael Vining as sole shareholder of Atlantic,[6] "in regard to Allied's proposed purchase, on the terms and conditions set forth below, of substantially all of the assets" of Atlantic. (2001 LOI at 1). Like the 1997 LOI, the 2001 LOI provides that the agreement will be based on "representations and conditions to be set forth in a definitive written purchase agreement" as well as other "pertinent conditions contingent to this transaction" as found in Exhibit A thereto. (Id.). Exhibit A provides that the transaction between Allied and Atlantic "is continent upon the following actions/activities taking place," including, *inter alia:*

■ Allied leasing Atlantic's facility for 10 years at a specified rate, with the "fair market value of the lease amount [being] confirmed by a third party independent appraisal";

■ Approval by the Town of Woburn for Allied's construction of "significant building additions/improve-

---

5. The 2001 LOI is found at Def. Ex. 1 at Ex. K.

6. David sold his interest in Atlantic to Michael in March 1999. (VSF (Docket No. 106) ¶ 113).

ments." This is expressly listed as "a condition precedent to the completion of this Transaction";

■ Allied is to be granted "a right of first refusal, on reasonable and mutually acceptable terms and conditions, on the purchase of the recycling facility"; and

■ The parties acknowledge that Allied may give Atlantic office and storage space at the facility during the term of Allied's tenancy, space permitting.

(2001 LOI at Ex. A). In addition, Exhibit A originally provided that:

"By acceptance of *this* Agreement, Allied and Seller acknowledge that all previous obligations required legally upon both parties have been met and are now completed."

(*Id.*) (emphasis added). However, the word "this" was changed to "the," with the change being initialed by the parties. (*Id.*).

The 2001 LOI set the purchase price for the assets at $5,300,000 and provided a payment schedule. (2001 LOI at 1–2). There was to be a 30 day period immediately following the closing during which Allied and Michael were to "conduct a reconciliation" of any prepaid accounts, with adjustments to be agreed upon no later than 45 days from the closing. (*Id.* at 2). However, no procedure for either conducting the reconciliation or resolving any disputes was provided. (*Id.*). The 2001 LOI recognized and placed the obligation on counsel for Allied and Michael to "promptly prepare the Agreement, other basic documents fulfilling the terms of this agreement in principle, and such other filings, exhibits, schedules, representations, warranties, terms and conditions as are customary in connection with transactions of this type, specifically including 5–year covenant-not-to-compete agreements with Seller covering the market area in which Seller now conducts business." (*Id.* at 2).

The documents were to be prepared "promptly so that the Transaction may be closed on or before October 1, 2001." (*Id.*).

The 2001 LOI further provided for the continuation of the business without significant change during the period between the date of "this agreement in principle" until "the Closing or termination of this Transaction[.]" (*Id.*). Further, like the 1997 Letter of Intent, the LOI provided that it was "expressly understood" that:

consummation of the Transaction is subject to, among other things, *execution of the Agreement,* approval by the board of directors of Allied, approval by such number of shareholders and directors of Seller as may be necessary under the applicable statutes and bylaws of Seller, *receipt of results satisfactory to Allied, in its sole discretion,* from a financial, operational and environmental review of Seller, and *receipt by Allied of all governmental approvals deemed necessary by Allied, in its sole discretion,* to proceed with the Transaction.

(*Id.* at 3) (emphasis added). The 2001 LOI also had a "non-shopping provision" which provided:

In consideration of the considerable expense to be incurred by Allied in connection with the proposed Transaction, none of you shall engage in any negotiation for the transfer, sale or assignment of all or any portion of the Assets or Business with another person for a period of ninety (90) days from the date of execution set forth below.

(*Id.* at 3). Finally, the LOI was to be signed if there was agreement "in principle with the terms as stated herein[.]" (*Id.*). Michael Vining, individually and as president of Atlantic, signed the LOI on July 9, 2001. (*Id.* at 4).

### *Events Following the 2001 LOI*

On September 14, 2001, Allied's counsel sent a draft of an acquisition agreement to Michael's counsel. (DSF ¶ 34). On October 22, 2001, after the closing date of October 1, 2001 had passed, Michael's counsel returned the draft agreement with comments. (*Id.*). There were substantial changes in the returned draft, including, without limitation:

- Atlantic refused to confirm that it was a "fully permitted" facility;

- It was proposed that Allied was to pay all legal, engineering and other costs for applying for the building permit for renovations to the recycling facility. The LOI had not addressed who was responsible for obtaining permits or who would pay the costs;

- Atlantic was no longer obligated to provide title insurance as Allied had proposed;

- Atlantic struck the provision for a revenue guarantee Allied had proposed, which was comparable to that which had been found in the 1997 Merger Agreement;

- Allied's due diligence rights were limited so that it would have had to have completed its due diligence and given notice to Atlantic by October 1, 2001 if the results of its due diligence were not satisfactory;

- Atlantic added the requirement that Allied be obligated to have applied for all approvals from the Town of Woburn to construct additions and/or improvements by November 1, 2001;

- Atlantic's proposed non-compete agreement limited the geographic area in which it applied from that proposed by Allied; and

- Allied's proposed lease was rejected in its entirety, with a new lease

agreement being proposed by Atlantic.

(DSF ¶¶ 34–39).

Despite the absence of signed agreements, Allied and Atlantic hired a Woburn zoning lawyer and a planning firm, and submitted an application to the Woburn Zoning Board of Appeals for a variance relating to the proposed construction. (DSF ¶ 41). A hearing on the application was held on December 12, 2001, and there were various objections raised. (DSF ¶ 42). After the hearing, the Board voted unanimously to deny the permit. (*Id.*). At the parties' request, the application was marked "withdrawn without prejudice." (*Id.*).

It is undisputed that by this time the parties were more than two months beyond the anticipated October 1, 2001 closing date, and that the 90–day no-shopping period had expired. (DSF ¶ 43). Without discussion as to whether the 2001 LOI continued in effect, the permitting application was resubmitted, for a substantially smaller project. (DSF ¶ 44). Similarly, the parties continued to discuss the draft agreements, and to suggest modifications given the changing circumstances. For example, but without limitation, on January 22, 2002, Michael Vining's counsel wrote to Allied's counsel asking for a response to his comments on Allied's draft and raising the issue whether Allied would be responsible for permitting. (DSF ¶ 45; Def. Ex. 4 at Ex. 15A). As he wrote in relevant part:

I am writing to ask when Allied will provide its further comments on the current draft of these agreements. Allied's local representatives had informed my client on several occasions that the closing would be in early February. Although that now appears to be unlikely due to the permitting issues for Allied's proposed addition to the building, my

client is intent on keeping this process moving toward completion. Would you please advise as to when Allied will be sending its comments to me on the pending drafts of the agreement and the lease.

Second, Allied's obligation to complete the transaction is contingent upon its obtaining approval from Woburn for its proposed addition/ improvements to the existing building. . . . My client has been trying to assist Allied in every respect possible to obtain the City's approval for its proposed addition. However, Francis Mastrangelo has now told my client that Allied is no longer willing to pay for its own architectural and legal costs in the permitting process, and has demanded that my client pay those costs without any promise of reimbursement by Allied, and even without any assurance as to when the closing will occur, or that it will occur. This is contrary to the agreement of the parties as reflected in the Letter of Intent which says nothing about my client paying for the improvements which Allied has determined to make to the building. Although my client agreed in November to advance the legal and architectural costs subject to reimbursement by Allied, this new demand is that he pay those costs without reimbursement. I am writing to bring this matter to your attention so that you can clarify this issue with your client, and arrange to have your client directly pay the necessary costs itself.

(Def. Ex. 4 at Ex. 15A). No response to this letter was forthcoming.

On March 27, 2002, Michael's counsel notified Allied's counsel that Woburn had granted a variance for the scaled-back project, which variance would become final on April 10, 2002. (DSF ¶ 48; Def. Ex. 9). At that time, Allied would be able to file its application for a building permit which, Michael's counsel noted, would need review and approval by the EPA. (Def.Ex.9).

This was because the site was a Superfund Site, as a result of which an agreement with the EPA had to be reached. (*See* DSF ¶ 47). Michael's counsel asked for a copy of the permit application to the EPA so that it could be reviewed, and further asked for comments on the outstanding draft agreements. (Def.Ex.9).

Although Michael knew that EPA approval had not yet been obtained, by letter dated April 23, 2002, Michael's counsel wrote to Allied's counsel demanding that Allied "forthwith perform its obligations as stated in an agreement between the parties dated August 8, 2001 and entitled 'Letter of Intent.'" (Def.Ex.10). Specifically, counsel stated that since the variance from Woburn had become final, Allied must proceed promptly to the closing and he proposed a closing date of May 15, 2002 "which should allow sufficient time to complete any additional documents and to finalize the lease." (Def.Ex.10).

Allied responded by letter dated May 2, 2002. Therein, Allied's counsel wrote:

Your letter indicates that by providing the documents requested by Allied and by obtaining the variance permit from the Town of Woburn, your client has met all of the conditions to close the transactions contemplated by the letter of intent. As the letter of intent indicates, however, Allied's obligation to close these transactions has many conditions, including for example, the execution of a definitive agreement, the approval of the board of directors of Allied, the receipt of results satisfactory to Allied, in its sole discretion, from a financial, operational and environmental review of Atlantic Packaging, and the receipt by Allied of all governmental approvals that Allied deems necessary to consummate the transactions.

Allied has been conducting, and continues to conduct, its due diligence review

of Atlantic Packaging. Allied anticipates that its due diligence review of Atlantic Packaging will continue beyond the May 15, 2002 date that you propose to close. Please be advised that Allied will contact your client when the review is complete.

(Def.Ex.11).

By letter dated May 13, 2002, now from litigation counsel, Michael demanded that Allied close on what was no longer being called a letter of intent, but was now referred to as the "Acquisition Agreement." (Def. Ex. 2 at Dep. Ex. 37). In this letter, counsel contended that Atlantic had satisfied all of its obligations, and that Allied must confirm "its binding commitment to proceed with and consummate the transaction contemplated by the Acquisition Agreement, pursuant thereto and by a date certain specified in such confirmation, not later than June 21, 2002." (*Id.* at 4–5). Counsel wrote further that "failing timely receipt of such written confirmation, Atlantic and Vining hereby declare Allied in default of its obligations under the Acquisition Agreement as of such date and time" and that upon such default Atlantic will consider itself free to negotiate with others concerning the sale of its business. (*Id.* at 5). Prior to this date, there is no evidence that Atlantic had raised the issue whether it was free to negotiate with others.

Allied's counsel responded by letter dated May 28, 2002. (Def.Ex.12). Therein, counsel stated that the Town of Woburn's approval had not been secured until April 11, 2002, that obtaining that approval had been the responsibility of Michael Vining and Atlantic, and that, as a result, "the delay associated with this approval cannot be attributed to Allied." (*Id.* at 1). In the interim, according to the letter, Allied had continued to review matters relating to Atlantic's business, the "results of Allied's financial due diligence [were] nearly complete and a financial diligence report [was]

being circulated to management for review and approval." (*Id.*). Moreover, counsel warned that the results of the financial due diligence might result in a price reduction "if the results of operations do not support the purchase price contemplated in the Letter of Intent." (*Id.* at 2). In addition, counsel noted that additional issues remained open, including, without limitation, environmental restrictions which had to be reviewed, additional approvals which had to be obtained, and the agreements between Allied and Atlantic, which had to be negotiated given the substantive changes that had been proposed by Atlantic. (*Id.*). The letter concluded with:

> Allied remains interested in closing the transactions contemplated by the Letter of Intent and intends to continue working toward finalizing this transaction. Given the significant issues that remain open, however, Allied is not in a position to commit to close this transaction and certainly not prior to June 21, 2002, as demanded in your letter.

(*Id.*).

Ultimately, Allied did seek a purchase price reduction from $5.3 million to $4.2 million. (DSF ¶ 59). Allied contended that increased labor costs arising out of the employees' decision to unionize after the LOI had been signed, among other things, required the reduction. (*Id.*). Allied also sent Michael draft documents which included various proposed changes. (DSF ¶ 60). While those documents were outstanding, Atlantic was sold to Woburn Recycling and Converting, Inc., a company owned by the Krafts who owned paper recycling facilities and the New England Patriots football franchise, for $3.9 million. (DSF ¶ 61). The transaction with the Krafts closed on November 29, 2002. (DSF ¶ 61). The zoning permits obtained with Allied's participation remained in ef-

fect regardless whether Allied consummated the acquisition of Atlantic. (DSF ¶ 62).

Additional facts will be provided below where appropriate.

## III. DISCUSSION

### A. Summary Judgment Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir.1996) (quotations and citations omitted). A material fact is one which has the "potential to affect the outcome of the suit under the applicable law." *Id.* (quotations and citations omitted).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial. *See Id.* at 324, 106 S.Ct. at 2553. The non-moving party "may not rest upon mere allegation or denials of his pleading," but must set forth specific facts showing that there is a genuine issue for trial. *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir.1993) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986)), *cert.*

*denied*, 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994). The court must view the record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor. *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir.1993), *cert. denied sub nom Town of Nahant v. O'Connor*, 510 U.S. 1024, 114 S.Ct. 634, 126 L.Ed.2d 593 (1993). "If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate." *Walsh v. Town of Lakeville*, 431 F.Supp.2d 134, 143 (D.Mass.2006).

### B. Enforceability of the 2001 LOI

Plaintiffs contend in Count III of their Amended Complaint that Allied breached the 2001 LOI "[b]y failing and refusing to consummate its purchase of the business and assets of Atlantic" (Am.Compl.¶ 54), and, in Count VI, that "[b]y failing and refusing to proceed with diligence and good faith to consummate the [2001 LOI],[7] Allied interfered with and frustrated the aforesaid reasonable expectations of Atlantic and Michael Vining and thereby breached its implied covenant of good faith and fair dealing." (Am.Compl.¶ 69). This court finds that the undisputed facts establish that the parties did not intend the 2001 LOI to be a binding and enforceable contract requiring Allied to purchase Atlantic. Consequently, this court recommends that summary judgment be entered in Allied's favor on these counts of the complaint.

In determining whether a letter of intent constitutes an enforceable contract, "[t]he controlling fact is the intention of the parties." *McCarthy v. Tobin*, 429

---

7. The Plaintiffs continuously refer to the LOI as the "Acquisition Agreement" in their complaint. Since the key issue is whether the LOI constitutes an enforceable agreement, the court will refer to the document at issue as the LOI.

Mass. 84, 87, 706 N.E.2d 629, 631 (1999), and cases cited. *Accord Hunneman Real Estate Corp. v. The Norwood Realty, Inc.,* 54 Mass.App.Ct. 416, 421, 765 N.E.2d 800, 804 (2002) ("The most recent pronouncements in our cases on the subject of the enforceability of precontractual agreements place great reliance on the intention of the parties"), and cases cited. "It is axiomatic that to create an enforceable contract, there must be an agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement." *Situation Mgmt. Sys., Inc. v. Malouf, Inc.,* 430 Mass. 875, 878, 724 N.E.2d 699, 703 (2000). "It is not required that all terms of the agreement be precisely specified, and the presence of undefined or unspecified terms will not necessarily preclude the formation of a binding contract … The parties must, however, have progressed beyond the stage of 'imperfect negotiation.'" *Id.* (citations omitted).

The parties' intention to be presently bound may be determined from the language of the letter of intent. *See Hunneman,* 54 Mass.App.Ct. at 421, 765 N.E.2d at 804. Moreover, "[t]he subsequent conduct and interpretation of the parties themselves may be decisive of the question as to whether a contract has been made[.]" *Id.* at 423 n. 11, 765 N.E.2d at 806 n. 11 (internal quotation omitted). Applying these principles to the instant case compels the conclusion that the parties did not have a present intention for the LOI to constitute an enforceable contract, and that they had not reached agreement on various material terms.

■ The language of the LOI itself makes it clear that the parties did not intend for it to be an enforceable agreement governing the acquisition of Atlantic. As an initial matter, the LOI expressly provides "that consummation of the Transaction is subject to, among other things,

execution of the Agreement." "When 'parties contemplate the execution of a final written agreement,' a strong inference is made that they 'do not intend to be bound by earlier negotiations or agreements until the final terms are settled.'" *Mass Cash Register, Inc. v. Comtrex Sys. Corp.,* 901 F.Supp. 404, 415 (D.Mass.1995) (quoting *Rosenfield v. U.S. Trust Co.,* 290 Mass. 210, 216, 195 N.E. 323, 325 (1935)). *See also Mendel Kern, Inc. v. Workshop, Inc.,* 400 Mass. 277, 281, 508 N.E.2d 853, 856 (1987) (fact that parties contemplated additional document "is cogent evidence that they did not intend that the letter of intent, even when accepted by [the plaintiff], would constitute a binding agreement"). Thus, while "the fact that a writing refers to a formal document to be executed in the future does not automatically prevent the initial writing from being binding," it is strong evidence "that the parties do not intend to be bound until the formal document is hammered out." *Gel Sys., Inc. v. Hyundai Eng'g & Constr. Co., Inc.,* 902 F.2d 1024, 1027 (1st Cir.1990).

Additional elements of the LOI confirm the parties' intentions not to be bound until the terms were finalized. For example, but without limitation, the document repeatedly refers to an "agreement in principle" and to the "proposed purchase" by Allied of Atlantic. It expressly notes that the purchase shall be based on "representations and conditions to be set forth in a definitive written purchase agreement," yet provides no guidance as to what those representations and conditions might be. The non-negotiation period is limited to 90 days, evidencing a recognition that further negotiations among the parties may be unsuccessful and that there may come a time when the parties enter into negotiations with others. In fact, there are a number of places where the parties expressly recognize that the proposed purchase may never take place. For example,

Atlantic is obligated under the LOI to maintain the *status quo* in its business operations "until the closing or termination of this Transaction[.]" Similarly, the LOI explicitly references each parties' responsibility for its own expenses "whether or not the Transaction is consummated." As is evident by these statements, the signing of the LOI in and of itself did not obligate Allied to acquire the assets of Atlantic.

This court also finds compelling evidence of the parties' intent in the fact that they changed the LOI to make it clear that the signing of "this Agreement" (the LOI) would not satisfy "all previous obligations required legally upon both parties." Rather, it would only be upon "acceptance of *the* Agreement" (emphasis added) that the previous obligations would be deemed to have been met and completed. This is a clear recognition that the signing of the LOI did not end matters between the parties, and that until the final documents were signed and delivered, "the game [was] not over." *See Tull v. Mister Donut Dev. Corp.*, 7 Mass.App.Ct. 626, 631–32, 389 N.E.2d 447, 450–51 (1979). Accordingly, this case presents the situation where the language of the LOI establishes that the parties "did not intend to be bound before the [final] contract was signed." *Reprosystem B.V. v. SCM Corp.*, 727 F.2d 257, 261 (2d Cir.1984), *cert. denied*, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984). *See also Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir.1989) (references in memorandum to the possibility that negotiations might fail and to a final agreement to be completed at a later date establish that party did not intend to be bound until final agreement was signed).

The subsequent conduct of the parties confirms that they intended to continue negotiations before being bound by a final agreement. Michael's counsel did not respond to the proposed drafts submitted by Allied until after the October 1st closing deadline had passed, thereby indicating that the terms of the LOI were negotiable. Moreover, when he responded, he made wholesale and significant changes—rejecting the lease in its entirety, rejecting the revenue guarantee which was important to Allied and which had been included in the 1997 Merger Agreement, setting time limits on approvals where none had previously existed, and addressing the issue of cost for the permitting process, among other things. Furthermore, Michael's subsequent communications continued to ask for comments on the outstanding drafts. It was not until it became useful for the Plaintiffs to term the LOI an "agreement" that they made any attempt to do so. These continued negotiations establish that "there was no mutual assent to the essential terms of an agreement." *Mass Cash Register, Inc.*, 901 F.Supp. at 417. Similarly, the fact that the parties were adding important terms after the LOI is evidence that they "did not intend for the [LOI] to contain the final terms of the transaction" and "did not intend to be bound by their preliminary agreement." *Dibiase Builders, Inc. v. Lovis Ave. Trust*, 18 Mass. L. Rptr. 438, No. 033063C, 2004 WL 2698280, at *4 (Mass.Super.Ct. Oct. 26, 2004), *aff'd sub nom DiBiase Builders, Inc. v. Campbell*, 65 Mass.App.Ct. 1106, 837 N.E.2d 729 (Mass.App.Ct.2005) (unpub.op.). *See also Mass. Hous. Fin. Agency v. Whitney House Assocs.*, 37 Mass.App.Ct. 238, 241, 638 N.E.2d 1378, 1380–81 (1994) ("A substantial variation in contract terms incident to a purported acceptance is not a binding acceptance but a counter offer"), *rev. denied*, 418 Mass. 1110, 642 N.E.2d 301 (1994).

This court finds the Plaintiffs' arguments to the contrary unpersuasive. For example, the Plaintiffs point to the fact that they were precluded by the 2001 LOI from making any significant changes in the

business as compelling evidence that the parties intended that the LOI be an enforceable contract to purchase Atlantic. However, the Plaintiffs ignore the fact that such a restriction was limited to the period between execution "of this agreement in principle, and until the Closing or termination of this Transaction[.]" (2001 LOI at 2). A "status quo" provision is not uncommon in connection with the purchase of an ongoing business. If the Plaintiffs had wanted to change their operation, they were free to terminate the Transaction.

Similarly, the Plaintiffs argue that the fact that they opened their books relating to the recycling collection and processing business to Allied evidences a present intention to be bound by the LOI. (*See* LOI at 2). However, Allied was obligated to keep all such information confidential (*id.*), and the "consummation of the Transaction [was] subject to, among other things, ... receipt of results satisfactory to Allied, in its sole discretion, from a financial, operational and environmental review of Seller[.]" (*Id.* at 3). Thus, Allied's review of the books did not indicate that it was thereby obligated to consummate the acquisition of Atlantic; rather, it was a step in the negotiation of final agreements.

In addition to the fact that the language of the LOI expresses a lack of intent to be bound by the LOI, there was no agreement as to material terms, which also precludes the LOI from being an enforceable contract. The proposed transaction was not a simple, uncomplicated purchase where either the LOI itself or custom and usage was sufficient to fill in blank terms. *Compare Goren v. Royal Invs. Inc.*, 25 Mass.App.Ct. 137, 140–41, 516 N.E.2d 173, 175–76 (1987) (agreement to buy building an enforceable agreement even absent a signed purchase and sale agreement where all significant economic issues were resolved in the preliminary agreement, the transaction was not particularly complex and it did not require intricate final documents), *rev. denied*, 401 Mass. 1104, 519 N.E.2d 595 (1988). Rather, it involved the purchase of an ongoing business requiring new construction, state and federal approvals, and companion agreements, among other things. It is true, as Plaintiffs' argue, that some material terms were specified in the LOI, but that does not in and of itself render the document an enforceable contract. *See Arcadian Phosphates, Inc.*, 884 F.2d at 70, 72–73 (memorandum of understanding to buy business was not an enforceable contract even though it specified, *inter alia*, the purchase price, timing and amounts of payments, and fixed assets to be purchased where other material provisions were less definite and the language of the agreement indicated parties did not intend to be bound until final agreements were signed). "It is not enough if parties negotiating have agreed upon certain important terms if there has been no agreement on other essential elements of the undertaking." *Cmty. Builders, Inc. v. Indian Motorcycle Assocs., Inc.*, 44 Mass.App.Ct. 537, 556, 692 N.E.2d 964, 976–77 (1998) (quoting *George W. Wilcox, Inc. v. Shell Eastern Petroleum Prods.*, 283 Mass. 383, 390, 186 N.E. 562 (1933)) (additional citation omitted).

The open material terms included, without limitation, the representations and conditions upon which the agreement was to be based, how the adjustments in the purchase price should be calculated, and how disputes should be resolved, which party should be responsible for obtaining permits and for the fees and expenses associated therewith, the timetable for obtaining such permits, the terms of the lease agreement, non-competition agreement and Allied's right of first refusal "on reasonable and mutually acceptable terms and conditions" for the purchase of the recycling facility, as well as an overall Closing Date.

(LOI at Ex. A). These are not elements for which "norms exist for their customary resolution," nor have the parties provided "formulae and procedures" to complete these material terms. *See McCarthy,* 429 Mass. at 87, 706 N.E.2d at 632, and cases cited. As evidenced by the fact that the Plaintiffs rejected the proposed revenue guarantee covering the pre-closing period despite having agreed to such a provision in 1997, the parties' own history could not be called upon to fill in the blanks in the LOI. In sum, the absence of agreement on material terms renders the LOI unenforceable as a contract.

Finally, the parties' conduct subsequent to signing the LOI did not render it an enforceable agreement requiring the purchase of Atlantic. The undisputed facts establish that the parties were working toward finalizing the purchase. Nevertheless, material provisions remained open, as detailed above, leaving either party free to terminate the proposed transaction. *See Arcadian Phosphates, Inc.,* 884 F.2d at 71 (part performance did not render a letter of intent an enforceable contract to purchase a business). Moreover, express conditions had not been satisfied. Not only had the parties failed to negotiate the critical lease and non-competition agreements, but EPA approval was still lacking. Allied had not completed its financial review of Atlantic either. While Plaintiffs complain that Allied had been doing its due diligence for years, it would make sense that the financial condition of Atlantic be assessed as close to a closing date as possible. Given that Allied's last price assessment of $4.2 million was in the range paid by the Krafts of $3.9 million, there is nothing obvious in the record to indicate that Allied's due diligence was just an excuse for not closing on the date demanded by the Plaintiffs.[8]

In sum, the proposed transaction was a complex one which was expected to and did involve extended negotiations which were never completed. The LOI did not create an enforceable agreement requiring Allied to purchase Atlantic under the terms contained in the LOI. Consequently, this court recommends that summary judgment be entered in Allied's favor on Count III of the Amended Complaint.

This court further recommends that judgment enter in favor of Allied on the claim of breach of the implied covenant of good faith and fair dealing. (Count VI). This implied covenant obligates the parties "to act in good faith to accomplish the purposes of their agreement. It does not, however, add new substantive obligations to their contractual undertakings." *McAdams v. Mass. Mut. Life Ins. Co.,* 391 F.3d 287, 301 (1st Cir.2004) (quoting *Sparks v. Fid. Nat'l Title Ins. Co.,* 294 F.3d 259, 274 (1st Cir.2002)). Thus, absent an enforceable contract, the Plaintiffs cannot maintain a claim for breach of an implied covenant of good faith and fair dealing. *See Christensen v. Kingston Sch. Comm.,* 360 F.Supp.2d 212, 226 (D.Mass. 2005) ("In order to demonstrate a claim for the breach of the covenant of good faith and fair dealing, the plaintiff must show that there existed an enforceable contract between the two parties.") (quotations and citations omitted).

## C. *Alleged Misrepresentations Re The 2001 LOI*

■ The Plaintiffs contend that Allied is liable for fraudulent misrepresentation and negligent misrepresentation (Counts VIII and X, respectively) because it allegedly

---

8. The court does not know the particulars of the Kraft transaction and the parties have just submitted the sale price at this juncture. Nothing herein should be read as a ruling that the proposed transaction with Allied and the Kraft transaction were comparable.

misrepresented its intention to consummate the acquisition of Atlantic. Thus, it is alleged that Allied "[mis]represented that it had the intention to and would proceed in good faith to complete the acquisition of the business and assets of Atlantic pursuant to the [LOI]." (Am. Compl.¶ 79). As the Plaintiffs argue in opposition to the motion for summary judgment:

Allied's attempt to unilaterally reduce the purchase price, and its insistence upon re-commencing its "due diligence" where it had not only conducted due diligence *before* the August 8th agreement, but had had complete access to Atlantic's premises and records at all times since, plainly permits an inference that it had merely used the August 8th Agreement as a means of diverting Plaintiff's claims for breach of the Product Agreement and to buy time while Atlantic's financial condition suffered further deterioration as a result of Allied's continuing failure to deliver recyclables, so that Allied could starve Vining into submission and ultimately acquire Atlantic at a distress price.

(Pls.' Opp. at 26–27). Because the Plaintiffs have failed to put forth any evidence that Allied misrepresented its intentions at the time it entered into the 2001 LOI, this court recommends that Allied's motion for summary judgment be allowed as to Counts VIII and X of the Amended Complaint.

Under Massachusetts law, to prevail on a claim of fraudulent misrepresentation, a plaintiff must prove that "the defendant made a false representation of material fact with knowledge of its falsity, that the defendant made the statement for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon that statement to his or her detriment." *Trent Partners & Assocs., Inc. v. Digital Equip. Corp.*, 120 F.Supp.2d 84, 108–09 (D.Mass. 1999) (quoting *Piantes v. Pepperidge*

*Farm, Inc.*, 875 F.Supp. 929, 933 (D.Mass. 1995)) (additional citations omitted). It is also well established "that statements of present intention as to future conduct may be the basis for a fraud action if the statements misrepresent the *actual intention* of the speaker and were relied upon by the recipient to his damage." *Zhang v. MIT*, 46 Mass.App.Ct. 597, 605, 708 N.E.2d 128, 134 (1999) (internal punctuation and citation omitted). The intention at issue "is the intention of the promisor when the agreement was entered into. The intention of the promisor not to perform an enforceable or unenforceable agreement cannot be established solely by proof of its nonperformance, nor does his failure to perform the agreement throw upon him the burden of showing that his nonperformance was due to reasons which operated after the agreement was entered into." *Id.* at 606, 708 N.E.2d at 135 (quoting Restatement (Second) of Torts § 530(1) cmt. d (1977)).

In the instant case, there is no evidence that Allied did not intend to consummate the acquisition of Atlantic or to engage in good faith negotiations of the final acquisition documents. Allied promptly submitted draft agreements to Atlantic and, while these drafts were not accepted, there is no evidence in the record that the proposals were outlandish. Allied participated in the permitting process, even after the initial proposals were rejected. The fact that the permitting process took longer than expected cannot, on this record, be blamed on Allied, and there is no evidence that Allied in any way impeded the process. Even though Allied did not respond promptly to the Plaintiffs' drafts, there is no evidence that Allied was ignoring the transaction or was no longer involved in obtaining the relevant approvals. In short, the record fails to establish that Allied did not participate in the process necessary for the eventual acquisition of

Atlantic, much less that Allied did not intend to fulfill its promises at the time it entered into the 2001 LOI. Therefore, summary judgment should enter in favor of Allied on the Plaintiffs' claim of fraud. *See Sargent v. Tenaska, Inc.*, 914 F.Supp. 722, 731 (D.Mass.1996) (absent evidence that the defendant formed the intent to defraud the plaintiff at the time they entered into their employment contract, summary judgment allowed in defendant's favor).

The Plaintiffs' claim of negligent misrepresentation fares no better. Under Massachusetts law, "in order to recover for negligent misrepresentation, a plaintiff must show that the defendant: (1) in the course of its business, (2) supplied false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance upon the information, and (6) that it failed to exercise reasonable care or competence in obtaining or communicating the information." *Cummings v. HPG Int'l, Inc.*, 244 F.3d 16, 24 (1st Cir.2001). Thus, "the degree of culpability a plaintiff must prove to establish liability for negligent misrepresentation is different, and less demanding, than that to establish liability for deceit." *Id.* Even under a claim of negligent misrepresentation, however, the Plaintiffs must establish that Allied's statements of intent were false when made, *i.e.*, when it entered into the 2001 LOI. *Id.* at 25. Since the Plaintiffs have failed to put forth any evidence of such falsity, summary judgment should enter in Allied's favor on the Plaintiffs' claim of negligent misrepresentation.

### D. *93A Claim Re The 2001 LOI*

■ In Count I of their Amended Complaint, Plaintiffs allege that Allied is liable under Mass. Gen. Laws ch. 93A, § 11 for unfair and deceptive acts or practices. As the Plaintiffs have explained in opposition to the motion for summary judgment, their 93A claim vis-à-vis the 2001 LOI is based on their contention that "Allied made deliberate or negligent misrepresentations regarding their intention to perform their obligations" under the LOI. (Pls.' Opp. at 33). Since, however, for the reasons detailed above, the Plaintiffs have failed to put forth any evidence that Allied misrepresented its intention at the time it entered into the LOI, the claim under ch. 93A must fail as well. *See Cummings*, 244 F.3d at 25 (affirming summary judgment for defendant on 93A claim based on a misrepresentation where record failed to show that the defendant made any deceitful or negligently false statements at the time the statements were made); *Mass Cash Register, Inc.*, 901 F.Supp. at 425 (where summary judgment entered on claim of misrepresentation, 93A claim based on same conduct dismissed as well). "Every deal that goes sour does not give rise to a c. 93A claim." *Pappas Indus. Parks, Inc. v. Psarros*, 24 Mass.App.Ct. 596, 600, 511 N.E.2d 621, 623 (1987) ("It is not … immoral, unethical, oppressive, or unscrupulous—and therefore not unfair or deceptive—to break off incomplete and imperfect negotiations of a commercial agreement"). Here, the Plaintiffs have failed to present any evidence which would warrant a trial on their ch. 93A claim.

In sum, because this court finds that the 2001 LOI does not constitute an enforceable agreement requiring Allied to purchase the business of Atlantic, and because there is no evidence that Allied misrepresented its intentions when it entered into the LOI, this court recommends that summary judgment be entered in favor of Allied on Counts III (breach of contract), VI (breach of implied covenant of good faith and fair dealing), VIII (fraudulent misrepresentation), and X (negligent misrepresentation), as well as the related portion of Count I (ch. 93A claim).

## IV. FACTS RELATING TO THE RECYCLING AGREEMENT

In connection with the 1997 Merger Agreement, the Vinings retained Atlantic, their separate paper recycling company. (DSF ¶ 3). On September 22, 1997, Atlantic and Allied entered into a "Recycling Agreement" pursuant to which Allied agreed to deliver, and Atlantic agreed to accept, certain paper recycling product collected by Allied. (*Id.*).[9] The Recycling Agreement provides in relevant part as follows:

1. Except as may otherwise be required by the term of a preexisting agreement (including agreements in which Allied's customer determines to which recycling facility its paper product is delivered), provided that Allied and Vining shall not induce a customer to cause its paper to be delivered to another facility, *Allied and Vining shall deliver exclusively to Atlantic and Atlantic shall accept from Vining all of the recyclable, source-separated cardboard, newspapers, paper supplies, and similar recyclable commodities which they collect in the Service Area, provided that the tonnage of such deliveries shall not exceed 400 tons per day* unless Atlantic increases its capacity and the terms of this Agreement are modified accordingly. Vining shall not deliver to Atlantic's facility any toxic, hazardous or other materials prohibited by law, but shall deliver only source-separated cardboard, paper and other paper items as provided herein and as have customarily been received by Atlantic for recycling. Atlantic understands that source-separated cardboard, paper and other paper items may include mixed loads.

2. *Atlantic shall accept all of such source-separated cardboard, paper and other commodities, and shall pay Allied monthly the market price therefor,* which shall not be less than the average price quoted by the two largest paper recycling competitors serving the Service Area. Atlantic reserves the right to refuse to accept, and upon notice Allied and Vining shall remove from Atlantic's facility, any loads which contain toxic, hazardous, or other materials prohibited by law, or which Atlantic does not customarily recycle.

3. Atlantic shall have the absolute right to deliver to the Plainville landfill facility any residual waste generated by Atlantic as a part of its recycling operations, and to provide Atlantic with a tipping fee for such residual waste at the lowest rate then in effect that Allied charges its inter-company operations at that facility. Atlantic shall be invoiced on a monthly basis and the invoiced amounts shall be paid within 30 days of the invoice date. If any invoiced amount which is not in dispute is not paid within 90 days of the invoice date, Vining shall have the right to terminate this Agreement upon giving notice to Atlantic to that effect.

4. The initial term of this Agreement shall be for ten (10) years from the date hereof. This Agreement may not be terminated or modified except by the written agreement of all parties hereto, shall be binding upon the parties hereto, their successors and assigns, and upon any successor or purchaser of the parties or of any portion of their businesses affected by the Agreement. This Agreement shall be specifically enforceable in the courts of the Commonwealth of Massachusetts with all legal and equitable remedies.

(emphasis added). Numerous disputes have arisen between the parties as to whether Allied was delivering all the product it was supposed to be delivering. The Plaintiffs argue that in 1997 before the

---

**9.** A copy of the Recycling Agreement has been submitted as Pls. Ex. C.

merger, Atlantic was receiving approximately 4,500–5,000 tons per month, while after the sale Atlantic's business fell below 3,000 tons per month, and this amount continued to decline. (*See* PSF ¶¶ 18–31). As noted above, these disputes eventually led to renewed discussions about Allied's potential acquisition of Atlantic.

Allied's motion for summary judgment raises two key issues of contract interpretation with respect to the Recycling Agreement. First, Allied is seeking a declaration from the court that the Recycling Agreement is "an installment contract, in which Allied's obligation to deliver recycling was predicated on Atlantic's tender of the correct price for the recycling, as defined in the Recycling Agreement." (Allied Mem. at 4). As Allied argues in its moving brief:

> Under the Recycling Agreement, *Atlantic was obligated to provide a price quote to Allied* that was at least equal to the price being paid by its two largest competitors in the service area. *When and to the extent Atlantic Packaging had tendered the correct price, Allied Waste was obligated to deliver paper and cardboard from within the Service Area* to Atlantic Packaging. Allied Waste accordingly asks this court to construe the Agreement as an installment contract, under which Allied Waste's obligation to deliver recycling to Atlantic Packaging arose if and only if Atlantic Packaging tendered the correct price, as it is defined in the agreement, for such recycling.

(Allied Mem. at 43) (emphasis added). For its part, Atlantic argues that the Recycling Agreement (which Atlantic refers to as the "Product Agreement") "contains no provision whatsoever obligating [Atlantic] to provide 'price quotes' to Allied as a precondition to Allied's obligation to deliver recyclables to it." (PSF ¶ 9). Rather, according to Atlantic:

Paragraph 1 of the Product Agreement unconditionally requires Allied to deliver all of its recyclables from the Service Area "exclusively to Atlantic." Paragraph 2 requires that Atlantic "pay Allied monthly the market price therefore, which shall not be less than the average price quoted by the two largest paper recycling competitors serving the service area." *Id.*, Paras 1, 2. Nothing in the Product Agreement requires either party to provide a "price quote" to the other and, having in mind that businesses [do] not generally furnish current pricing information to their competitors, the price provisions of the Product Agreement are necessarily interpreted as providing that if Allied did not believe, in any instance, that the price actually paid by [Atlantic] for product delivered [was correct], it was incumbent upon Allied to notify [Atlantic] of the price that it believed was applicable and to provide appropriate documentation therefore.

(PSF ¶ 9).

The second contract interpretation issue raised by Allied's motion for summary judgment relates to the definition of "Service Area" in the Recycling Agreement. In the preamble, the Recycling Agreement provides in relevant part:

> WHEREAS, Atlantic also received recyclable paper supplies from other companies, including those companies which Allied has either recently purchased or may purchase in the future in the Greater Boston and North Shore area (the "Service Area");

(Recycling Agreement at 1). A dispute has arisen as to whether the "Service Area" includes the City of Boston. In a letter dated January 13, 2000 to Bruce Stances of Allied, which was attached to the Complaint, Michael Vining, as President of Atlantic, wrote "I have listed below all of the towns considered to be North

Shore, Greater Boston," and he did not include the City of Boston. (Pls.Ex.D). Allied has asked that this court declare that the letter is controlling and that the City of Boston is not included in the Service Area. The Plaintiffs contend, however, that the term obviously includes Boston, that deliveries were consistently made from Boston, and that the parties discussed what cities and towns were included and agreed that "[t]he Service Area included everything within Route 128 from Boston and Northerly beyond Route 128 up to Route 495 and included Boston itself and Quincy." (PSF ¶ 7).

In addition to seeking declaratory relief, Allied is seeking summary judgment on the Plaintiffs' claims of fraudulent and negligent misrepresentation relating to the Recycling Agreement. Thus, in Count VII of the Amended Complaint the Plaintiffs contend that Allied misrepresented "that it had the intention to and would deliver Recyclable Products in the quantities provided pursuant to the Product Agreement" (Am.Compl.¶ 72), and in Count IX the Plaintiffs contend that Allied is liable under a theory of negligent misrepresentation. Finally, Allied is seeking summary judgment on Plaintiffs' claim that such conduct violated Mass. Gen. Laws ch. 93A as alleged in Count I of the Amended Complaint.

Additional facts will be provided below where appropriate.

## V. DISCUSSION OF THE RE-CYCLING AGREEMENT

### A. Atlantic's Obligation to Provide Price Quotes

■ Allied is claiming that Atlantic failed to pay Allied enough for the recyclables that Allied delivered. For its part, Atlantic contends that Allied failed to deliver all of its recyclables, as required by the Recycling Agreement. As described above, by its motion for summary judg-

ment, Allied was originally seeking a declaration in effect that its performance under the Recycling Agreement would be excused if Atlantic failed to provide monthly price quotes. In its latter brief Allied seems to indicate that it is seeking a declaration that its performance would be excused if Atlantic did not pay it the appropriate amount each month. (See Allied's Reply Brief (Docket No. 120) at 9 ("the Court should find as a matter of law that, to the extent Atlantic is unable to establish that, for each delivery or allegedly required delivery, it paid the correct price to Allied or was ready, willing and able to pay that price, Atlantic cannot recover for any under deliveries of product by Allied. The Court should also find that, to the extent Allied delivered recyclables to Atlantic in months where Atlantic failed to pay the correct price, Allied is entitled to recover damages for the difference between the actual price paid by Atlantic and the price Atlantic should have paid for the recyclables that Allied delivered.")). In this court's view, either argument should fail and Allied's motion for summary judgment as to the Recycling Agreement should be denied. The clear language of the Agreement does not require Atlantic to give price quotes as a precondition to Allied having to deliver product. Furthermore, the failure of Atlantic to charge the correct price does not, either as a matter of the parties' Agreement or as a matter of law, automatically excuse Allied from performance under the Recycling Agreement. Since the record is devoid of any relevant facts relating to the appropriateness or inappropriateness of any amounts paid by Atlantic, or even the circumstances as to how those amounts were set, summary judgment is not warranted at this time.

As the First Circuit recently explained in *Teragram Corp. v. Marketwatch.com, Inc.*, 444 F.3d 1, 9 (1st Cir.2006):

"[U]nder Massachusetts law, interpretation of a contract is ordinarily a question of law for the court," *Bank v. Int'l Bus. Machs. Corp.*, 145 F.3d 420, 424 (1st Cir.1998) (quoting *Coll v. PB Diagnostic Sys., Inc.*, 50 F.3d 1115, 1122 (1st Cir. 1995)) (internal quotation marks omitted), "unless there are material disputes as to extrinsic facts bearing on the correct interpretation," *McAdams v. Mass. Mut. Life Ins. Co.*, 391 F.3d 287, 298 (1st Cir.2004). "This is true even in 'close cases'; the jury does not become involved when words and context alone are used, but only when extrinsic evidence is at issue." *Id.* "Even if a contract might arguably appear ambiguous from its words alone, the decision remains with the judge if the alternative reading is inherently unreasonable when placed in context." *Id.* at 299. When construing a commercial contract, "[c]ommon sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons." *Fishman v. LaSalle Nat'l Bank*, 247 F.3d 300, 302 (1st Cir.2001); *see also id.* ("The presumption in commercial contracts is that the parties were trying to accomplish something rational.").

*Teragram*, 444 F.3d at 9.

"Moreover, where the contract is unambiguous, it is to be enforced according to its terms." *Fairfield 274–278 Clarendon Trust v. Dwek*, 970 F.2d 990, 993 (1st Cir.1992), and cases cited. "The contract must be construed as a whole, in a reasonable and practical way, consistent with its language, background and purpose." *Cady v. Marcella*, 49 Mass.App.Ct. 334, 338, 729 N.E.2d 1125, 1129–30 (2000) (internal quotation and citation omitted), *rev. denied*, 432 Mass. 1107, 737 N.E.2d 467 (2000). "In interpreting a contract, the court must construe all words that are plain and free from ambiguity according to their usual and ordinary sense." *Suffolk Constr. Co., Inc. v. Lanco Scaffolding Co.,*

*Inc.*, 47 Mass.App.Ct. 726, 729, 716 N.E.2d 130, 133 (1999). "Contract language is ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken. However, an ambiguity is not created simply because a controversy exists between parties, each favoring an interpretation contrary to the other's." *Id.* (internal quotations and citations omitted).

In the instant case, there is absolutely nothing in the Recycling Agreement which would have obligated Atlantic to provide a monthly price to Allied and would have limited Allied's obligation to deliver recyclables such that it would have arisen only "[w]hen and to the extent Atlantic Packaging had tendered the correct price." (Allied Mem. at 43). Rather, the Recycling Agreement simply requires Allied and Vining to "deliver exclusively to Atlantic" all of the "recyclable commodities which they collect in the Service Area," with exceptions which are not relevant here. (Recycling Agreement ¶ 1). For its part, Atlantic agreed to "pay Allied monthly the market price therefor, which shall not be less than the average price quoted by the two largest paper recycling competitors serving the Service Area." (*Id.* ¶ 2). There is no basis in the Agreement to impose a burden on either party to provide price quotes, and this court cannot find any support for Allied's argument. Similarly, neither party suggests that, as a matter of fact, they conditioned Allied's performance on an appropriate price quote or that such an arrangement was common in the industry. (*See, e.g.,* DSF ¶¶ 15–16; PSF ¶ 10). In sum, Allied's interpretation of the contract as requiring Atlantic to tender a correct price quote before Allied had to deliver recyclables is not supported by the contract language or the record,

and its motion for summary judgment, accordingly, should be denied.

To the extent that Allied is seeking a declaration that Atlantic's failure to pay the appropriate amount each month excused Allied's performance, this argument, too, must fail. First of all, there are no facts which indicate that Atlantic did not pay the correct amount each month, so there is no basis for this court to address the issue at all. There is no case or controversy to warrant the entry of a declaratory judgment. *See Diaz–Fonseca v. Puerto Rico,* 451 F.3d 13, 39 (1st Cir.2006) ("The Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202 . . ., empowers a federal court to grant declaratory relief in a case of actual controversy.") (quoting *Ernst & Young v. Depositors Econ. Protection Corp.,* 45 F.3d 530, 534 (1st Cir. 1995)).

■ Furthermore, even assuming that the Recycling Agreement is considered an installment contract under the UCC, and that Atlantic did not pay the correct amount each month, Atlantic's failure to pay the correct amount would not automatically void Allied's obligation to provide all of the recyclables it collected from the Service Area. This, too, would be a fact-specific inquiry, and Allied has not proffered the relevant facts.

Briefly, the UCC defines an installment contract as "one which requires or authorizes the delivery of goods in separate lots to be separately accepted . . . ." Mass. Gen. Laws ch. 106, § 2–612(1). It allows the buyer to reject any non-conforming installment "if the nonconformity substantially impairs the value of that installment and cannot be cured," but if "the seller gives adequate assurance of its cure the buyer must accept that installment." *Id.* at § 2–612(2). There is only a breach of the whole contract if the "non-conformity or default with respect to one or more installments substantially impairs the value of

the whole contract" and even then the aggrieved party may reinstate the contract "if he accepts a nonconforming installment without seasonably notifying of cancellation. . . ." *Id.* at § 2–612(3).

Assuming, without deciding, that these principles govern Atlantic's monthly payment obligations, there is no evidence that Atlantic was given any opportunity to cure any breach. Absent such an opportunity, Allied cannot invalidate the whole contract. *See Allan R. Hackel Org., Inc. v. Am. Radio Sys. Corp.,* No. 980335, 2000 WL 281689, at *2 (Mass.Super.Ct. Jan. 12, 2000) (unrep. dec. relied on by Allied) (plaintiff estopped from seeking damages on remainder of installment contract where plaintiff failed to notify defendant that its performance under contract was non-conforming). Moreover, even if it is considered an installment contract, it may simply mean that Allied has a separate cause of action for each month the amount paid was improper. *See Berezin v. Regency Sav. Bank,* 234 F.3d 68, 73 (1st Cir.2000) (relied on by Allied) (promissory note considered an installment contract as a result of which "the statute of limitations for the recovery of each installment under the note runs from the time it becomes due"); *Flannery v. Flannery,* 429 Mass. 55, 58, 705 N.E.2d 1140, 1143 (1999) (relied on by Allied) (alimony payments considered installment contract as a result of which the statute of limitations runs from each breach). Thus, the declaratory judgment requested by Allied is neither supported by the law nor by the facts and should be denied.

### B. *The Service Area*

■ Allied's request that the Service Area in the Recycling Agreement, which is defined as the "Greater Boston and North

Shore area," be deemed to exclude Boston proper must fail. Such a definition defies common sense and finds no support in the record.

Allied does not dispute that the common meaning of the phrase "Greater Boston" would include the City of Boston. Thus, organizations such as the Greater Boston Chamber of Commerce and Greater Boston Real Estate Board include the City of Boston itself. The American Heritage Dictionary of the English Language defines "Greater" to mean "[o]f, relating to, or being *a city considered together with its populous suburbs: the greater metropolitan area of Dallas; Greater Los Angeles.*" Houghton Mifflin Co., The American Heritage Dictionary of the English Language (4th ed.2000) (emphasis added). Similarly, Webster's New World Dictionary of the American Language, (Second College Ed.) defines the word "Greater" as "designating a large city *together* with its suburbs." (emphasis added) Therefore, giving the term its usual and customary meaning, Greater Boston as used in the Recycling Agreement should be interpreted to include the City of Boston itself.

Allied argues that the letter written by Michael Vining on January 13, 2000, three years after the Recycling Agreement, is binding on Atlantic and that the City of Boston was not included in the "towns considered to be North Shore, Greater Boston." (Pl.Ex.D). The letter appears to be an effort to clear up any confusion between the parties. However, there would be no reason for Michael Vining to specifically list Boston, a city which is obviously included. Furthermore, there is no indication that the letter was intended to be a binding document amending the agreement in any way. Even if it were, the "amendment" must fail as it lacked consideration. *See Vakil v. Anesthesiology Assocs. of Taunton, Inc.,* 51 Mass.App. Ct. 114, 120, 744 N.E.2d 651, 656 (2001) ("a

written agreement may be modified by a subsequent oral agreement *made on sufficient consideration*") (emphasis added), *rev. denied,* 434 Mass. 1104, 752 N.E.2d 240 (2001). Finally, the record shows that Allied routinely delivered product under the Agreement from facilities in Boston, thereby defeating any argument that the parties, by their conduct, omitted Boston from the definition of the Service Area. (*See* Knapp Aff. (Docket No. 125) ¶¶ 2–4, Ex. A). For these reasons, Allied's request for a ruling that Greater Boston excludes the City of Boston itself should fail, and its motion for summary judgment as to the Recycling Agreement should be denied.

## C. *Misrepresentation and 93A Claims*

■ Plaintiffs argue that Allied is liable for fraud and negligent misrepresentation in connection with the Recycling Agreement because it never intended to comply with the terms of the Agreement. Rather, Plaintiffs contend, "Allied never took the Product Agreement seriously and only offered it to induce the Vinings' (sic) to part with VDSI." (Pls.' Opp. at 26). In fact, the Recycling Agreement expressly provided that Allied's obligations thereunder "constituted a material inducement to the stockholders of Atlantic and Vining to agree to the sale of [VDSI] to Allied" as consummated by the 1997 Merger Agreement. (Recycling Agreement at preamble p. 2; PSF ¶ 3). This court believes that, in contrast to the circumstances surrounding the 2001 LOI, there are sufficient facts for a jury to find that Allied misrepresented its present intention to comply with the terms of the Recycling Agreement when it entered into the Agreement in 1997. Therefore, this court recommends that Allied's motion for summary judgment as to Count VII of the Amended Complaint be denied. Since there is no evidence that Allied's misrepresentations

as to its present intention to comply with the terms of its Agreement were negligently made, however, this court recommends that Allied's motion for summary judgment as to Count IX be allowed.

In support of its misrepresentation claim, Atlantic points to evidence that Michael Vining's complaints that Allied was not living up to its agreement to send recyclables to Atlantic, which began shortly after the Agreement was consummated, fell on deaf ears. (*See* PSF ¶¶ 13–14, 17). In response to his complaints, Michael was told that "Allied had other operational problems in the Boston district and couldn't worry about delivering recyclables to [Atlantic]." (PSF ¶ 20). Allied took the position that the Agreement "sucked" and was "difficult" to follow. (PSF ¶ 21). Complying with the Agreement "was not a priority" according to Allied (PSF ¶ 24), and Allied made no effort to investigate the complaints by Vining. (*See* PSF ¶ 27). There is evidence in the record that Allied asserted that it believed that the Agreement "wasn't worth the paper it's written on." (PSF ¶ 30). These allegations are sufficient to create an issue of fact as to Allied's intention when it entered into the Recycling Agreement.

As noted above, misrepresentations may form the basis of a claim under Mass. Gen. Laws ch. 93A. Since Atlantic's fraudulent misrepresentation claim as to the Recycling Agreement survives Allied's motion for summary judgment, to the extent that Count I of the Amended Complaint relates to misrepresentations allegedly made in connection with the Recycling Agreement,

Allied's motion should be denied with respect to that claim as well.

## VI. STATEMENT OF FACTS RE POST–CLOSING ADJUSTMENTS [10]

Allied acquired all of the outstanding stock of VDSI pursuant to the 1997 Merger Agreement [11] in exchange for, *inter alia*, 1,120,000 shares of Allied stock, $3,200,000 in cash, and a promissory note in the amount of $1,315,000, all to be delivered to Michael and David Vining, and a small number of additional Allied shares deliverable to the holders of VDSI preferred stock (collectively, the "Purchase Price"). (VSF ¶ 9). As equal shareholders, Michael and David were to split their portion of the Purchase Price equally. (*Id.*).

According to the Merger Agreement, the Vinings' portion of the Purchase Price was subject to certain post-closing adjustments. (VSF ¶ 13). These adjustments, which were to be made 60 days after the closing, could have the effect of either increasing or decreasing the Purchase Price. (VSF ¶¶ 14–15, 21). The purpose of such post-closing adjustments was to permit the parties to modify the Purchase Price to more accurately reflect the financial condition of the company as of the date of the closing, and the adjustments were to be based on financial data more current than that available at the time the Merger Agreement was signed. (*See* VSF ¶¶ 18–20).

The Merger Agreement provided "benchmarks" as of the closing for the two

---

**10.** The relevant facts are derived from David T. Vining's Concise Statement of Material Facts (Docket No. 106), which is cited as "VSF." David's Exhibits (Docket No. 107) will be cited as "DV Ex." Allied's response to these facts, included in its Rule 56.1 Counter–Statement of Facts (Docket No. 121) will be

cited as "RVSF." The various affidavits submitted by the parties will be identified by the declarant's last name along with the Docket Number of the filing.

**11.** The Merger Agreement is found at Def. Ex. 2 at Dep. Ex. 19.

elements of the post-closing adjustment—those elements being aggregate debt and working capital. (VSF ¶¶ 16–17, 22; Merger Agreement at § 1.6(c)). Working capital is current assets minus current liabilities. If VDSI's financial statements, as adjusted after the closing, did not coincide with each benchmark, then the Purchase Price was to be increased or decreased by the difference between the benchmark and the adjusted financials. (VSF ¶ 16). Specifically, if after post-closing adjustments were made, the working capital of VDSI was less than the benchmark, VDSI would owe Allied the difference, while Allied would owe VDSI the difference if the working capital was greater than the benchmark. With respect to the aggregate debt benchmark, if the post-closing aggregate debt of VDSI was greater than the benchmark that was expected at the time of closing, then VDSI would owe Allied the difference. Conversely, if the aggregate debt was less than the benchmark, Allied would owe VDSI the difference.

It was typical for Allied's acquisition deals to use debt and working capital as the two elements of a post-closing adjustment, and the language used for the post-closing adjustment in the Merger Agreement was typical for Allied's acquisition deals at the time. (VSF ¶ 22). In connection with the closing, the Vinings' accountant, Stanley Caras, calculated the current assets and liabilities of VDSI. (VSF ¶ 123–24). He used the VDSI financials that were present at the closing, and made no reference to the terms of the Merger Agreement to do his calculations. (VSF ¶ 125). The calculations were attached as Exhibit 1.6c to the Merger Agreement under the heading "Estimated Working Capital Statement Current Assets and Current Liabilities." (See Poutasse Aff. (Docket No. 78) at ¶ 4, Ex. 2).

Allied's first post-closing adjustments were reflected in a letter dated September 11, 1998, approximately 351 days after the closing. The Vinings contend that this adjustment was untimely. Allied contends that the Vinings continued to submit VDSI invoices to Allied for payment of outstanding balances which had accrued prior to the closing through the Summer of 1998, making it impossible for Allied to conduct the post-closing adjustments within 60 days of the closing. (RVSF ¶¶ 21, 83). Moreover, according to Allied, the Vinings never complained about the timeliness of Allied's calculations. (RVSF ¶ 21).

By its letter of September 11, 1998, Allied advised the Vinings that, in accordance with the post-closing adjustment language of the Merger Agreement, the Vinings owed $1,566,359.95 to Allied consisting of two elements as follows:

| | |
|---|---|
| $2,305,660.09 | working capital adjustment |
| (739,300.14) | debt adjustment |
| $1,566,359.95 | |

(VSF ¶¶ 24–25). The Vinings disagreed. Following its receipt of objections from the Vinings' CPA, Stanley Caras, Allied sent new "draft" calculations under cover of letter dated November 9, 1998. (VSF ¶ 34). At this time, Allied claimed the Vinings owed $790,123.41, calculated as follows:

| | |
|---|---|
| $2,305,660.09 | working capital adjustment |
| (739,300.14) | debt adjustment |
| $ 790,123.41 | |

(VSF ¶ 34–35). The Vinings raised various objections to this calculation as well, which resulted in an "updated draft" being sent by Allied for review and discussion under cover of letter dated June 29, 1999. (VSF ¶ 41). Pursuant to this letter, the Vinings now owed $1,047,394.07, calculated as follows:

| | |
|---|---|
| $1,525,694.21 | working capital adjustment |
| (739,300.14) | debt adjustment |
| 261,000.00 | missing assets |
| $1,047,394.07 | |

(VSF ¶ 41–42). Allied has continued to recalculate the post-closing adjustments

throughout this litigation, and now contends the Vinings owe approximately $1.6 million. The Vinings object to a great number of the calculations performed by Allied. According to David, Allied owes the Vinings $3,099,311.72. (VSF ¶ 92).

Allied has brought claims against Michael and David for amounts due under the post-adjustment calculations, while the Vinings have filed claims against Allied for amounts they claim are due. Allied and David Vining have moved for summary judgment seeking a declaration as to various aspects of their post-closing calculations. Each issue will be discussed separately below.

The motions for summary judgment require the court to interpret two provisions of the Merger Agreement. The first is Section 1.6(c), which provides in relevant part as follows:

Section 1.6 Closing Procedures; Price....

(c) As of the Time of Closing: (i) the aggregate debt of the Company (defined as current and long-term portions of bank, mortgage, shareholders, etc., notes or loans payable, including remaining payments on capitalized or non-capitalized equipment leases) shall not exceed $4,028,000 ("Company Debt") except to the extent that additional debt was incurred to acquire additional trucks or other equipment since July 7, 1997 for which there is a corresponding dollar asset value, in which case, no adjustment shall be made. Pursuant to the provisions of Section 1.7 hereof, Allied and Shareholders shall adjust the Purchase Price, positively or negatively, by an amount equal to the difference between the actual amount of aggregate long-term debt of the Company at the Time of Closing and $4,028,000 as so adjusted; and (ii) Company's ratio of current assets to current liabilities (exclusive of current portion of long-term

debt) shall not be less than 1.0 to 1.0. Pursuant to the provisions of Section 1.7 below, Allied and Shareholders shall adjust the amount of cash deliverable at the Time of Closing (positively or negatively) by an amount equal to the difference between current assets and current liabilities as shown on Exhibit 1.6c ("Estimated Working Capital Statement"). The terms "current assets" and "current liabilities" shall have the meanings ascribed to them under generally acceptable accounting principles. If the adjustment is negative, it shall be deducted from cash deliverable at the Time of Closing. If the adjustment is positive, Allied shall pay additional cash to Shareholders within 10 days of the Time of Closing.

The second relevant provision is Section 1.7(a), which provides in relevant part as follows:

Section 1.7 Adjustments Purchase Price; Procedure

(a) Within the 60 day period after the Closing Date, Allied shall deliver to Shareholders a statement of Company's net working capital as of the Closing ("Final Working Capital Statement"). The working capital set forth on the Final Working Capital Statement shall be determined by subtracting current liabilities from current assets as shown on the Estimated Working Capital Statement in accordance with generally accepted accounting principles ("gaap") and adding to current assets the sum of $108,000 because it was deducted at the request of Allied....

Additional facts will be provided where appropriate.

## VII. DISCUSSION RE 1997 MERGER AGREEMENT ISSUES

### A. The Definition of Working Capital

 Allied and David Vining each have moved for summary judgment on the issue

whether, in calculating the post-closing working capital figure, the current portion of long term debt and VDSI's bank line of credit should be included. Allied contends that these items should be included in determining the company's current liabilities.[12] David Vining, however, claims that the current portion of long term debt should be excluded from the post-closing calculation. This court concludes that construing the contract "as a whole, in a reasonable and practical way, consistent with its language, background and purpose," Allied is correct and the Merger Agreement's post-closing adjustment of VDSI's working capital includes VDSI's line of credit and the current portion of long term debt in establishing the current liabilities. See Cady, 49 Mass.App.Ct. at 338, 729 N.E.2d at 1129–30 (quotations and citation omitted).

Section 1.6(c)(ii) provides the working capital benchmark. As noted above, this sections provides as follows:

Pursuant to the provisions of Section 1.7 hereof, Allied and Shareholders shall adjust the Purchase Price, positively or negatively, by an amount equal to the difference between ... (ii) *Company's ratio of current assets to current liabilities (exclusive of current portion of long-term debt) shall not be less than 1.0 to 1.0.* Pursuant to the provisions of Section 1.7 below, Allied and Shareholders shall adjust the amount of cash deliverable at the Time of Closing (positively or negatively) *by an amount equal to the difference between current assets and current liabilities as shown on Exhibit 1.6c* ("Estimated Working Capital Statement"). *The terms "current assets" and "current liabilities" shall have the meanings ascribed to them under generally acceptable accounting principles.* If the adjustment is negative, it shall be deducted from cash deliverable

at the Time of Closing. If the adjustment is positive, Allied shall pay additional cash to Shareholders within 10 days of the Time of Closing.

(Emphasis added).

Section 1.7 provides in relevant part:

(a) Within the 60 day period after the Closing Date, Allied shall deliver to Shareholders a statement of Company's net working capital as of the Closing ("Final Working Capital Statement"). The working capital set forth on the Final Working Capital Statement shall be determined by *subtracting current liabilities from current assets as shown on the Estimated Working Capital Statement in accordance with generally accepted accounting principles* ("gaap")....

(Emphasis added).

It is undisputed that the "current liabilities as shown on Exhibit 1.6c ('Estimated Working Capital Statement')," which was created by the Vinings' accountant Stanley Caras, included VDSI's bank line of credit and the current portion of long-term debt of VDSI. (*See* Poutasse Aff. (Docket No. 78) at ¶¶ 5–18). It is also undisputed that generally acceptable accounting principles ("GAAP") defines current liabilities to include those that are due and payable within one year, and would include VDSI's bank line of credit and the current portion of the company's long-term debt. (*See id.* at ¶ 12). Therefore, giving the terms of the Merger Agreement their plain meaning, and examining the parties' apparent understanding of working capital as set forth in Exhibit 1.6c, the definition of working capital should be deemed to include the bank debt and current portion of long-term debt.

Such an interpretation also would be consistent with the purpose of the post-

12. David does not dispute that the line of credit should be included.

closing adjustments. By including the line of credit and current portion of long term debt in both the determination of working capital benchmark as of the time of closing and post-closing, the parties would be comparing "like" definitions of working capital. The Estimated Working Capital Statement and the subsequent Final Working Capital Statement would be comparing the same elements. This result is consistent with David Vining's own explanation of the purpose of the post-closing adjustments, namely "to permit the parties to modify the purchase price to reflect more accurately the financial condition of the subject business as of the closing date." (VSF ¶ 19).

David Vining, however, contends that the phrase in Section 1.6(ii) (italicized above), which requires that the "Company's ratio of current assets to current liabilities (exclusive of current portion of long-term debt) shall not be less than 1.0 to 1.0," requires the post-closing calculation to exclude the current portion of long-term debt. He hypothesizes that there could have been a business reason for making different comparisons at the time of the closing and afterwards. (*See* David's Mem. (Docket No. 105) at 22–25). For example, he suggests that because Allied intended to pay off virtually all VDSI debt immediately, "VDSI would not need to generate positive working capital sufficient to pay off the current portion of long-term debt." (*Id.* at 23). "Another plausible explanation" offered by David was that "VDSI had bid for and won new contracts for trash pickup in two municipalities during the period that Allied was negotiating to buy VDSI" and needed to buy new trucks, and that excluding the current portion of long term debt would somehow remove the Vinings' "incentive to delay the purchase of equipment that would benefit Allied." (*Id.* at 24). To his credit, David adds that he "cannot and does not argue that there is undisputed

evidence, or even any evidence, that the language drafted by Allied was prompted by this line of reasoning. No witness has testified to any memory respecting the reasons for the words used or to discussions between the parties about the words. There is no evidence at all, pro or con." (*Id.* at 25). In fact, David's rather convoluted explanations are inconsistent with the undisputed fact that the benchmarks were common in Allied's agreements, and that the purpose of the post-closing adjustments was to make sure—using more current information—that the calculations done at the time of closing were accurate. (*See* VSF ¶¶ 18–20). These undisputed facts run counter to David's new contention that specific facts about the status of VDSI's business deals at the time of the closing were considered when developing the method for undertaking post-closing adjustments.

A much more logical reading of the Merger Agreement is that the ratio of 1.0 to 1.0 for "current assets and current liabilities (exclusive of current portion of long term debt)" to be achieved at closing is a distinct requirement. (*See* RVSF ¶ 62). Working capital is not defined anywhere as involving a ratio. The sentence at issue is not related to either the estimate or final determination of working capital. While perhaps not a model of clarity, this court finds that the ratio language is a stand-alone provision, that the Agreement is not ambiguous, and that the post-closing assessment of working capital includes the line of credit and the current portion of long-term debt. Moreover, the alternative reading, as proposed by David, "is inherently unreasonable when placed in context." *McAdams*, 391 F.3d at 299. Finally, even if the language is deemed ambiguous, the circumstances surrounding the execution of the Agreement, the creation of the Estimated Working Capital Statement, and the undisputed intent of

the post-closing adjustment process leads to the inescapable conclusion that the comparisons were to be of "like" calculations, and only one interpretation of the contract provision is logical. *See id.* at 298 (where there is no dispute as to extrinsic facts bearing on the interpretation, the interpretation is a question of law for the court).

## B. *The Definition of Aggregate Debt*

█ David Vining has moved for summary judgment on the definition of aggregate debt, the other benchmark for post-closing adjustments. Specifically, David contends that in determining the amount of debt at the closing, the parties were to consider both the current and long-term portions of bank debt. However, he argues that in reevaluating the amount of debt post-closing, the parties were only to consider the long-term portions of bank debt. (*See* David's Mem. at 18–19). This court concludes that there is serious doubt as to David's interpretation of the Agreement, and that his motion for summary judgment on this issue should be denied.[13]

This issue arises out of the following provisions of the Merger Agreement. Section 1.6(c) provides:

As of the Time of Closing: (i) the *aggregate debt* of the Company *(defined as current and long-term portions of bank,* mortgage, shareholders, etc., notes or loans payable, including remaining payments on capitalized or non-capitalized equipment leases) shall not exceed $4,028,000....

Pursuant to the provisions of Section 1.7 hereof, Allied and Shareholders shall adjust the Purchase Price, positively or negatively, by an amount equal to the difference between the *actual amount of*

*aggregate long-term debt* of the Company at the Time of Closing and $4,028,000 as so adjusted....

The ambiguity arises from the use of the phrase "aggregate **long-term** debt" in the post-closing assessment. Had the Agreement just said "aggregate debt" there is no question that under the parties' own definition it would have included the current and long-term portions of bank debt. Similarly, if the parties had referred to the GAAP definition of long-term debt, it is undisputed that it would have included the current portion of long-term debt, *i.e.* that amount of the debt that is due in a year or less. (*See* David's Mem. at 19). Furthermore, for the reasons detailed above, the circumstances surrounding the execution of the Agreement, and the purpose of the post-closing adjustments lead to the conclusion that the comparisons between the closing benchmark and post-closing calculations should be of "like" figures.

Nevertheless, the Agreement does seem to distinguish between "aggregate debt" and "aggregate long-term debt." In particular, the definition of aggregate debt distinguishes between current and long-term debt. Furthermore, in Allied's post-adjustment calculations, which were sent to the Vinings on September 11, 1998 and November 9, 1998, the schedule of the components of the "aggregate debt" lists the "current portion long term debt" and "long term long term debt" separately. (*See* DV Exs. 17, 18). In construing a contract, each word is expected to have a meaning. *J.A. Sullivan Corp. v. Commonwealth,* 397 Mass. 789, 795, 494 N.E.2d 374, 378 (1986) (every phrase and clause must be given meaning and effect whenever practicable). Therefore, summary judg-

---

13. Allied has suggested that the court enter summary judgment in its favor on this issue *sua sponte,* since it has not moved for summary judgment. While this court does find Allied's contract interpretation to be far more persuasive, there is a conflict in the language of the Agreement itself which may be more appropriately resolved by a fact finder.

ment on the issue of the definition of the aggregate debt as used in the post-closing calculations is not appropriate at this time.

## C. *Missing Assets*

Pursuant to the Merger Agreement, Allied acquired all the assets of VDSI. (Merger Agreement Section 1.2). The Agreement provides further that "[i]n order to cause Allied to enter into this Agreement and to consummate the Transaction contemplated hereby, Shareholders [the Vinings] and Company [VDSI]" made various "representations, warranties and convenants." (*Id.* at Article II). In Section 2.12(b) it was represented that a schedule of assets, attached as Exhibit 2.12, "is complete and correct," that the assets "have been well maintained" and that they were "in good operating condition and repair" among other things. (*Id.* at Article II, Section 2.12(a)-(b)). Allied contends that the Vinings failed to deliver assets totaling $261,000 which were listed on Exhibit 2.12, and has asserted claims against David and Michael Vining based on that failure. David contends that he cannot be liable for this amount as a matter of law. Because there are disputed facts relating to this claim, this court recommends that David's motion for summary judgment as to the "missing assets" be denied.

As an initial matter, David argues that Allied improperly considered the missing assets as part of its post-closing adjustments. (*See* David's Mem. at 16). This is a non-issue. As Allied has represented:

Although Allied informed the Vinings of its claim for missing assets in the context of discussions about post-closing adjustments concerning the Aggregate Debt Adjustment and the Working Capital Adjustment, *Allied is not attempting to argue that its claim for missing assets is part of those adjustments.* Allied is simply asserting that Michael and David Vining breached their obligations under the Merger Agreement to deliver

to Allied all of the assets to which Allied is entitled under the agreement.

(Allied's Opp. (Docket No. 118) at 7 (emphasis added)). Therefore, there is no need for this court to determine whether missing assets are appropriately considered as part of the post-closing adjustments.

David further argues that any claim that Allied may have for the missing assets would be limited to a conversion claim against Michael or Atlantic for some amount of money, although such a claim would be barred by the statute of limitations. (David's Mem. at 16). He argues further that Allied "would never have had a claim against David, who had completely dropped out of business life on July 2, 1997, the day his wife died" in a car accident. (*Id.;* VSF ¶¶ 6, 7).

In light of the fact that David Vining was a 50% shareholder of VDSI and a party to the Merger Agreement, and a 50% shareholder of Atlantic until March 1999, David's motion for summary judgment must fail. (VSF ¶¶ 4, 113). Based on the record before the court, Allied could bring suit against David for breach of the Merger Agreement. There are factual disputes as to whether the assets were actually missing. Therefore, summary judgment is not warranted at this time.

## D. *Insurance Payables*

David has also moved for summary judgment on the issue whether Allied appropriately included "accrued insurance" in the amount of $230,037.41 to increase current liabilities in its post-closing adjustments. This was raised by Allied for the first time in its June 29, 1999 post-closing adjustment draft. At issue is whether liabilities for insurance deductibles could and should have been accrued by VDSI at the time of closing and, therefore, should be included in the post-

closing adjustment of working capital. Again, this court finds that there are disputed facts which render summary judgment inappropriate at this time.

The parties agree that GAAP requires the accrual of a liability for insurance contingencies when the contingency is considered probable and the amount of the loss or expense can be reasonably estimated. (VSF ¶ 80). David Vining has submitted an Affidavit of Elizabeth Eccher, a Vice President of Analysis Group, Inc. of Boston, an economic consulting company. Ms. Eccher opines that at the time of closing VDSI could not reasonably estimate the future contingent losses for the insurance claims, as a result of which they should not be considered in calculating working capital. (Eccher Aff. (Docket No. 107) at ¶¶ 7–8). For its part Allied has submitted the Declaration of Charles D. Poutasse, a CPA, who opined that VDSI could have reasonably estimated its future insurance deductible liabilities as of the closing, and that this amount should be included in VDSI's liabilities as of that date.[14] (Poutasse Decl. (Docket No. 122) at ¶ 21). Based on these conflicting opinions, summary judgment is not warranted at this time.

### E. *Trade Payables*

Finally, David Vining contends that miscellaneous trade payables, totaling $29,107.22, were improperly characterized as current liabilities of VDSI as of the closing. Allied has withdrawn its claims for a post-closing adjustment with respect to three of these accounts: Hodge Products, Tire Centers, Inc. and Transriver Marketing. (*See* Allied's Opp. at 15–16 n. 8). This leaves invoices from Mass Sand & Gravel in the amount of $19,599.58, which VDSI claims should not have been paid, and from Manchester Mack in the amount of $3,974.79, which VDSI contends should have been covered by warranties. The disputed items are all reflected in invoices submitted to Allied for payment, and the facts as to whether these bills should have been paid are in dispute. (*See* Poutasse Decl. (Docket No. 122) at ¶¶ 36–57). Consequently, David's motion for summary judgment on these trade payables should be denied.

### VIII. *CONCLUSION*

For the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that Allied's motion for summary judgment (Docket No. 75) be ALLOWED IN PART and DENIED IN PART and that David Vining's motion for summary judgment (Docket No. 104) be DENIED. Specifically, with respect to the three agreements at issue in this case, this court recommends as follows:

*The 2001 Letter of Intent:* This court finds that the 2001 LOI executed by the parties does not rise to the level of an enforceable contract, and that the record does not support a finding that Allied misrepresented its intention to perform under the LOI at the time of its execution. Therefore, this court recommends that Allied's motion for summary judgment be ALLOWED as to Count III (breach of contract), Count VI (breach of implied covenant of good faith and fair dealing), Count VIII (fraudulent misrepresentation), Count X (negligent misrepresentation), and Count I (Mass. Gen. Laws ch. 93A) to the extent this count relates to Allied's performance under the LOI.

*The Recycling Agreement:* This court finds that the clear terms of the Recycling

---

14. Allied also contends that Ms. Eccher has modified her opinion in her deposition. (*See* Allied's Supp. Opp. (Docket No. 152) at 4).

Agreement did not require Atlantic to proffer its price list monthly as a condition precedent to Allied's obligation to deliver recyclables. Further, the term "Greater Boston area" as used in the Recycling Agreement includes the City of Boston. Therefore, this court recommends that Allied's motion for summary judgment, which asked this court to interpret the Recycling Agreement to the contrary, be DENIED. This court further concludes that there is sufficient evidence to go to the jury on the issue whether Allied misrepresented its intentions to perform under the Recycling Agreement, but not whether such misrepresentations were made negligently. Therefore, this court recommends that Allied's motion for summary judgment as to Count VII (fraudulent misrepresentation) and Count I (Mass. Gen. Laws ch. 93A) to the extent this count relates to Allied's performance under the Recycling Agreement, be DENIED, and that the motion as to Count IX (negligent misrepresentation) be ALLOWED.

*The Merger Agreement:* Both Allied and David Vining have asked this court to interpret various provisions of the 1997 Merger Agreement. This court finds that the current portion of long term debt should be included in the post-closing adjustment of working capital, and that Allied's motion should therefore be AL-

LOWED. However, there are disputed facts which preclude the entry of summary judgment on the points raised by David Vining. Therefore, this court recommends that David's motion for summary judgment be DENIED.[15]

---

**15.** The parties are hereby advised that under the provisions of Fed.R.Civ.P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. *See*

*Keating v. Sec'y of Health & Human Servs.,* 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 604–605 (1st Cir.1980); *United States v. Vega,* 678 F.2d 376, 378–79 (1st Cir.1982); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *see also Thomas v. Arn,* 474 U.S. 140, 153–54, 106 S.Ct. 466, 474, 88 L.Ed.2d 435 (1985). *Accord Phinney v. Wentworth Douglas Hosp.,* 199 F.3d 1, 3–4 (1st Cir.1999); *Henley Drilling Co. v. McGee,* 36 F.3d 143, 150–51 (1st Cir.1994); *Santiago v. Canon U.S.A., Inc.,* 138 F.3d 1, 4 (1st Cir. 1998).